# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF MISSISSIPPI
### GREENVILLE DIVISION

**BOARD OF MISSISSIPPI LEVEE**
**COMMISSIONERS**                                                    **PLAINTIFF**


**v.**                                               **CIVIL ACTION NO.: 4:09CV81-SA-DAS**


**UNITED STATES ENVIRONMENTAL PROTECTION**
**AGENCY, LISA P. JACKSON, in her official capacity**
**as Administrator; and PETER S. SILVA, in his capacity**
**as Assistant Administrator for Water**                             **DEFENDANTS**


**v.**

**NATIONAL WILDLIFE FEDERATION,**
**MISSISSIPPI WILDLIFE FEDERATION,**
**and ENVIRONMENTAL DEFENSE FUND**              **INTERVENOR-DEFENDANTS**


## MEMORANDUM OPINION

Before the Court is Board of Mississippi Levee Commissioners' Motion for Summary
Judgment [31], [32]; Environmental Protection Agency's Cross Motion for Summary
Judgment [38]; and National Wildlife Federation, Mississippi Wildlife Federation, and
Environmental Defense Fund's Cross Motion for Summary Judgment [41].[1] After reviewing
the motions, responses, rules, and authorities, the Court finds as follows:

---

[1] The Sierra Club, Gulf Restoration Network, and American Rivers also join in the
arguments made by Defendant Intervenors [47]. The Court notes that for purposes of this
Memorandum Opinion, any reference made to the "Defendants" applies to both the original
Defendant and the Defendant Intervenors, unless otherwise specified.

# I. LEGAL AND FACTUAL BACKGROUND

This dispute arises from the United States Environmental Protection Agency's ("EPA") decision to veto, under Section 404(c) of the Clean Water Act, 33 U.S.C. § 1251 *et seq*., the Yazoo Backwater Project. The issue presented in this action, while fairly narrow, appears to be quite novel. The Board of Mississippi Levee Commissioners contends that the EPA's veto was illegal because the Yazoo Backwater Project is exempt from Section 404(c) regulation under Section 404(r) of the Clean Water Act. As such, this case turns on whether the Yazoo Backwater Project falls within Section 404(r)'s limited exemption.

The Yazoo Backwater Project has an extensive history. The Project at its basic level is an effort to control flooding in Mississippi, consisting of various flood control levees, pump stations, drainage channels, and floodgates. The "part" of the Project at issue here concerns the construction of a single pump station to pump water out of the Yazoo Backwater Area during flooding of the Mississippi River. In order to sort out the tangled history of the Project, the Court first discusses the governing statutory law at issue, before turning to the Project's origins and how it evolved out of administrative and legislative processes.

***Governing Statutory Law***

A. The Clean Water Act

*General Overview of Section 404*

Congress passed the Clean Water Act ("CWA") in 1972 with the goal of "restor[ing] and maintain[ing] the chemical, physical, and biological integrity of the Nation's waters." 33 U.S.C. § 1251(a) (1994). The CWA regulates the discharge of dredged or fill material into the navigable waters of the United States through a permit system under Section 404 of the Act.

Id. at § 1344.  The Army Corps of Engineers ("Corps") administers this system. Id. at 1344(c), (d).  To issue a Section 404 permit, the Corps must ensure that a number of regulatory requirements are met.  A dredge or fill action (1) must not "cause or contribute to significant degradation of the waters of the United States," see 40 C.F.R. § 230.10(c) (1999), (2) must not cause or contribute to a water quality violation, see id. at § 230.10(b)(1), and (3) must be in the public interest, see 33 C.F.R. § 320.4(a) (1999).  Although the Corps does not issue Section 404 permits to itself for dredge or fill activities that it implements, see 33 C.F.R. § 335.2 (1999), Corps projects must generally comply with EPA's regulatory requirements for dredge and fill permits, commonly referred to as the "404(b)(1) guidelines," see id. at 335.1, 337.6.

*EPA's Veto Power under Section 404(c)*

Section 404(c) was enacted in 1972, apparently for purposes of striking a compromise between the Corps and the EPA.[2]  Under Section 404(c), the EPA may prohibit discharges within specified areas when it determines – after notice and an opportunity for public hearing and consultation with the Corps – that there would be an "unacceptable adverse effect on

---

[2] See COMMITTEE ON PUBLIC WORKS, 93D CONGRESS, 1ST SESSION, A LEGISLATIVE HISTORY OF THE WATER POLLUTION CONTROL ACT AMENDMENTS OF 1972, Volume 1 at 177 (Comm. Print 1973) (joint conference report):

> The Conferees were uniquely aware of the process by which dredge and fill permits are presently handled and did not wish to create a burdensome bureaucracy in light of the fact that a system to issue permits already existed. At the same time, the committee did not believe that there could be any justification for permitting the Secretary of the Army to make the determination as to the environmental implications of either the site to be selected or the specific spoil to be disposed of in a site. Thus, the Conferees agreed that the Administrator of the [EPA] should have the veto over the selection of the site for dredged spoil disposal and over any specific spoil to be disposed of in any selected site.

municipal water supplies, shellfish beds and fishery areas (including spawning and breeding areas), wildlife or recreational areas." 33 C.F.R. § 1344(c) (1982). The regulations implementing section 404(c) direct the EPA to consider relevant portions of the 404(b) guidelines when considering a 404(c) action, see 40 C.F.R. § 231.2(e) (1988), as a basic function of section 404(c) is to police application of the guidelines, see 44 Fed. Reg. 58,078 (1979) (preamble).[3]

*Exemption under Section 404(r)*

In the 1977 Amendments to the CWA, Congress exempted from Section 404 permit requirements certain federal construction projects. 33 U.S.C. § 1344(r). Section 404(r) provides as follows:

> The discharge of dredged or fill material as part of the construction of a Federal project specifically authorized by Congress . . . is not prohibited by or otherwise subject to regulation under this section, or a State program approved under this section . . . (except for effluent standards or prohibitions under § 307 [33 U.S.C. § 1317 (1982)]), if information on the effects of such discharge, including consideration of the guidelines developed under subsection (b)(1) of this section, is included in an environmental impact statement for such project pursuant to the National Environmental Policy Act of 1969 and such environmental impact statement has been submitted to Congress before the actual discharge of dredged or fill material in connection with the construction of such project and prior to either authorization of such project or an appropriation of funds for such construction.

Id. Section 404(r)'s "narrow exemption" was added to the CWA "in recognition of the constitutional principle." See COMMITTEE ON PUBLIC WORKS, 95TH CONGRESS, 2D SESSION, A LEGISLATIVE HISTORY OF THE CLEAN WATER ACT OF 1977 A CONTINUATION OF THE

---

[3] Apparently, although the Corps processes approximately 60,000 permit actions a year, the EPA has only issued a Section 404(c) final veto action thirteen times since 1972. See EPA, Clean Water Act Section 404(c) Veto Authority. The Yazoo Pump Project constituted the twelfth veto action, and the first one used since 1989. Id. This appears to be the first Section 404(c) veto action to be judicially challenged under Section 404(r) of the CWA.

LEGISLATIVE HISTORY OF THE FEDERAL WATER POLLUTION CONTROL ACT, Volume 3 at 524, 288 (Comm. Print 1978). However, Congress "limited the exemption so as to ensure that the Congress will have full information on the impacts of the dredged or fill material associated with the project when it determines whether or not to authorize the project or to appropriate funds for its construction." Id. at 288. Thus, a federal project "specifically authorized" by Congress may be exempt from the EPA's veto authority under Section 404(c) if the requirements of Section 404(r) are met. That is, the Conference Report "emphasized that the failure of a project to meet the[ ] [Section 404(r)] requirements will result in the project having to obtain a section 404 permit." Id.

B.  National Environmental Policy Act

The National Environmental Policy Act of 1969 ("NEPA"), 42 U.S.C. § 4321 *et seq.*, is an "essentially procedural" statute, meant to ensure "a fully informed and well-considered decision." Vermont Yankee Nuclear Power Corp. v. Natural Res. Def. Council, Inc., 435 U.S. 519, 558, 98 S. Ct. 1197, 55 L. Ed. 2d 460 (1978). To ensure a well-considered decision, NEPA requires that when an agency proposes a "major Federal action[ ] significantly affecting the quality of the human environment," the agency must prepare and circulate for public review and comment an environmental impact statement ("EIS") that examines the environmental impact of the proposed action and compares the action to other alternatives. 42 U.S.C. § 4332(2)(C).[4]

---

[4] The NEPA EIS requirement is designed to inject environmental considerations "in the agency decisionmaking process itself," and to "help public officials make decisions that are based on understanding of environmental consequences, and take actions that protect, restore, and enhance the environment." Dep't of Transp. v. Pub. Citizen, 541 U.S. 752, 768-69, 124 S. Ct. 2204, 159 L. Ed. 2d 60 (2004); see also 40 C.F.R. § 1502.1 ("The primary

An EIS must be detailed, and it must be prepared in consultation with other federal agencies with special expertise relevant to the proposed action's environmental impact. Id. An EIS must explain in detail (1) "the environmental impact of the proposed decision," see id. at § 4332(2)(C)(i); (2) "any adverse environmental effects which cannot be avoided should the proposal be implemented," see id. at § 4332(2)(C)(ii); (3) the "alternatives to the proposed actions," see id. at § 4332(2)(C)(iii); (4) the relationship between local short-term uses of man's environment and the maintenance and enhancement of long-term productivity," see id. at § 4332(2)(C)(iv); and (5) "any irreversible and irretrievable commitments of resources which would be involved in the proposed action should it be implemented," see id. at § 4332(2)(C)(v). Implicit in this statutory requirement "is an understanding that the EIS will discuss the extent to which adverse effects can be avoided." Robertson v. Methow Valley Citizens Council, 490 U.S. 332, 351-52, 109 S. Ct. 1835, 104 L. Ed. 2d 351 (1989).

With authority derived from NEPA, the Council on Environmental Quality ("CEQ") has been directed to promulgate regulations applicable to *all* federal regulations.[5] See 40 C.F.R. § 1500. Each federal agency must also develop its own regulations, which are to be consistent with the CEQ regulations. Id. at § 1507.3. Such regulations applicable to the Civil Works Program of the Corps are published at 33 C.F.R. § 230 *et seq.*[6]

_____

purpose of an environmental impact statement is to serve as an action-forcing device to insure that the policies and goals defined in the Act are infused into the ongoing programs and actions of the Federal Government.").

[5] The Council on Environmental Quality's authority is also derived from President Jimmy Carter's Executive Order 11991, delegating authority to the CEQ to promulgate formal regulations binding on all federal agencies.

[6] "This regulation provides guidance for implementation of the procedural provisions of the National Environmental Policy Act (NEPA) for the Civil Works Program of the U.S. Army Corps of Engineers. It supplements Council on Environmental Quality (CEQ)

In regards to the preparation of an EIS, CEQ regulations state that an EIS shall be prepared in two stages: a draft stage and a final stage. 40 C.F.R. § 1502.9. The essential process is as follows: A draft EIS "shall" be prepared first, and then it must be published in order to obtain comments from the public and from the appropriate federal, state, and local agencies. Following a public comment period, a final EIS "shall" be prepared. The final EIS must respond to all comments received on the draft EIS. In response to comments received and in preparing the final EIS, the agency may modify the alternatives, information, or analyses contained in the draft EIS. See id. at § 1503; see also 33 C.F.R. § 230.19(d). Further, an agency can requests comments on a final EIS before a decision is finally made. See id. at § 1503.1(b).

In order to complete the required NEPA and EIS process, the CEQ and Corps regulations both require the preparation of a Record of Decision ("ROD"). 40 C.F.R. § 1505.2 ("At the time of its decision (§ 1506.10) or, if appropriate, its recommendation to Congress, each agency shall prepare a concise public record of decision."); 33 C.F.R. § 230.14 ("A record of decision shall be prepared by the district commander . . . for the signature of the final decisionmaker as prescribed by applicable Corps regulations."). The ROD is a statement of the agency's final decision, and it should identify all alternatives considered and specify the alternative(s) deemed to be environmentally preferable. 40 C.F.R. § 1505.2. The agency should explain the rationale for its decision concerning which alternative to implement. Id. The agency also must state whether all practicable means to avoid or minimize environmental

regulations 40 CFR Parts 1500 through 1508, November 29, 1978, in accordance with 40 CFR 1507.3, and is intended to be used only in conjunction with the CEQ regulations. Whenever the guidance in this regulation is unclear or not specific the reader is referred to the CEQ regulations." 33 C.F.R. § 230.1

harm have been adopted in the decision, and if not, why they were not. Id. The CEQ and NEPA regulations require an agency to discuss possible mitigation measures in the EIS and in the ROD. See id. at §§ 1508.25(b)(3), 1502.14(f), 1502.16(h), 1505.2(c).

***Yazoo Backwater Project History***

   A.  The Flood Control Act of 1941

The history of the Yazoo Backwater Project actually starts with a predecessor of the Flood Control Act ("FCA") of 1941: the FCA of 1928, which was passed in response to the Mississippi Flood of 1927. See FLOOD CONTROL ACT OF 1928, 70th Cong., Sess. 1, Ch. 596 (May 15, 1928). The 1928 FCA authorized, through the Mississippi River and Tributaries Project, the construction of a system of river levees. The FCA of 1928 also funded the construction of diversion floodways that would route off some of the Mississippi floodwaters before reaching the River's lower reaches.

In March 1941, the Mississippi River Commission ("MRC") issued a report, recommending that the Yazoo Backwater Area be protected from floods by extending the Mississippi River levee to and along the west bank of the Yazoo. See FLOOD CONTROL ON THE LOWER MISSISSIPPI RIVER, H. Doc. 77-359 at 38 (1941). The report also cautioned that this levee would introduce a number of drainage problems, especially on the Sunflower River. Due to this, the MRC studied and proposed three different plans to remedy the drainage problem. Plan "A" considered placing levees on both banks of the Sunflower River. Plan "B" called for an extension of the main river east bank levee to a junction with a previously-authorized level along the west bank of the Yazoo River. The last plan, Plan "C," was similar to Plan "B," yet it also added a measure to increase the height of the levee to fifty-six and a

half feet. Plans "B" and "C" also both contemplated that lands within the backwater area below the ninety-foot contour would be used for sump storage. According to the report, this ninety-foot contour was chosen because lands below that elevation are "not suited to agriculture" due to frequent flooding. As such, the report suggested utilizing these flood-prone lands to store floodwater. However, lands above the ninety-foot contour would be protected by a series of pumps "to prevent the sump level from exceeding 90 feet."

As a continuing part of its generalized flood control program, Congress passed the 1941 FCA, authorizing the Corps to spend $12 million to construct a "project for flood control of the Yazoo River," including "combinations of reservoirs, levees, and channel improvements," in accordance with the Commission's March 1941 report. FLOOD CONTROL ACT OF 1941 § 3(b), Pub. L. 77-288, 55 Stat. 639 (Aug. 18, 1941). Of the three plans discussed in the report, the 1941 FCA authorized Plan "C." Accordingly, the plan authorized under the FCA is for a levee system and a system of pumps to protect lands in the Yazoo Backwater Area above the ninety-foot contour, with lands below that level being dedicated to flood storage.

B. Reevaluation Report – Environmental Impact Statement of 1982

After the passage of the 1941 FCA, the Corps designed and constructed a number of interrelated structures for flood damage protection. However, the 1941 FCA authorized plan was continuously reexamined – specifically in 1958, 1959, and 1962 – by the Corps, with each review concluding that a series of pumping plants were no longer needed to provide the

permitted level of flood protection for the Yazoo Backwater Area.[7]  Following the 1973 Mississippi Flood, the Corps once against reevaluated the plan in 1978.  This 1978 reevaluation led to a proposal to drain a significant portion of the acreage below the ninety-foot contour, which Congress had previously dedicated to flood storage.

The proposed modification was documented in a July 1982 Reevaluation Report-Environmental Impact Statement ("1982 Reevaluation EIS").[8]  The 1941 FCA called for a series of pumping plants at three separate locations in the Yazoo River Basin; however, the 1982 Reevaluation EIS recommended a revised plan with one pumping plant that had a capacity of 17,500 cubic feet per second.  Likewise, while the 1982 Reevaluation EIS recognized that the 1941 FCA "was not intended to protect lands below elevation 90 feet," it recommended a modification in the plan to prevent sump level from exceeding either 80 or 85 feet.  This was apparently recommended to address a problem that did not exist when Congress passed the 1941 FCA.  That is, as noted in the Yazoo Area Pump Project Post

_____

[7] Specifically, the 1982 Yazoo Area Pump Project Post Authorization Change Notification Report – which is discussed in more detail below – provides that:

> Although levees, channel work, and pumps were authorized by the Flood Control Act  . . . both World War II and the Korean War occurred during the time this work would have been accomplished.  In 1954, Congress directed the Chief of Engineers to review all Mississippi river and Tributaries Projects to determine if modifications were needed . . . [T]he Chief of Engineers recommended modification of several projects, including the Yazoo Backwater Project. The major modifications . . . were deletion of the Big Sunflower and Deer Creek drainage structures, the inclusion of a 27-mile connecting channel between the Little Sunflower and Steele Bayou drainage structures, and the deferral of construction of pumping plants until some future time, with the number, location, and size of the pumps to be determined if and when future conditions and economic justification warranted installation.

See 2 Compendium 624.

[8] See United States Army Corps of Engineers, The Yazoo Area Pump Project Reevaluation Report-Environmental Impact Statement (July 1982, revised Nov. 1982) (3 Compendium 1209).

Authorization Change Notification Report, the modification to the plan was "to provide flood protection to those additional lands which have been converted to agricultural production since initial authorization."[9]

The 1982 Reevaluation EIS was prepared around the same time as a Post Authorization Change Notification Report ("Post Authorization Report"). The purpose of this Post Authorization Report was to determine whether specific congressional authorization was required to implement the various changes made in the 1982 Reevaluation EIS. On February 3, 1983, the Post Authorization Report and the 1982 Reevaluation EIS were sent to Major General John Wall, Director of Civil Works of the Army Corps.[10] Major General Wall, in approving the Post Authorization Report, concluded specific congressional authorization was *not* required for the 1982 Reevaluation EIS; therefore, the authority to sign and approve the 1982 Reevaluation EIS was "delegated," under the Corps' engineering regulations ("E.R."), to the MRC.[11]

C.  Yazoo Backwater Project – Fish and Wildlife Mitigation Report[12]

Yet another report lingers in the backdrop of this case and overlaps with the 1982 Reevaluation EIS and the Post Authorization Report. In the Post Authorization Report, it was noted that a "Fish and Wildlife Mitigation Plan ha[d] been developed in combination with the

---

[9] See Yazoo Area Pump Project Post Authorization Change Notification Report, at 2 (July 1982, revised Nov. 1982) (2 Compendium 622, 624).

[10] See 2 Compendium 629, 630.

[11] See 2 Compendium 630 (Major General Wall delegating authority); 2 Compendium 640-41 (President of the MRC approving the 1982 Reevaluation Report EIS).

[12] This heading represents the entire name of the report. That is, the "Mitigation Report's" full name is the Yazoo Backwater Project – Fish and Wildlife Mitigation Report. Importantly, the plan stemming from the Yazoo Backwater Project – Fish and Wildlife Mitigation Report is an *entirely separate project* than the proposed Yazoo Area Pump Project.

recommended pump plan." This Mitigation Plan was prepared by the MRC in order to comply

with the Fish and Wildlife Coordination Act of 1958 ("FWCA").[13]  The FWCA requires the

Corps to consult with the United States Fish and Wildlife Service, as well as other agencies,

concerning impacts to wildlife resulting from water development projects. See 16 U.S.C. §

662(a) (discussing the required consultations between agencies).  According to the Post

Authorization Report, the Mitigation Plan under consideration was a proposal to acquire

6,500 acres of land to "mitigate" the impacts of the "Yazoo Area and Satartia Area Levee

Projects" and the "proposed Yazoo Area Pump Project." Based on the nature of the Mitigation

Report, it was determined that specific congressional approval *would be* necessary. When

Major General Wall approved the Post Authorization Report, he noted that the Corps was

"considering the Mississippi River Commission's report on fish and wildlife mitigation and

[would] dispatch the proposed Chief of Engineers' report to States and agencies in the near

future."

The Mitigation Report was transmitted to such States and agencies on March 28, 1983.

See Letter from Lieutenant General J.K. Bratton, Chief of Engineers of the Army Corps, to

Charles R. Jeter, Regional Administrator of the EPA (2 Compendium 631). In Lieutenant

General Bratton's letter, he stated:

> Enclosed for your review and comment are seven copies of the proposed report
> of the Chief of Engineers on Yazoo Backwater Project, Mississippi – Fish and
> Wildlife Mitigation Report, and other pertinent reports and a Final
> Environmental Impact Statement with addendum prepared in accordance with
> Section 102 (2) (C) of the National Environmental Policy Act of 1969 (Public
> Law 91-190).  The Yazoo Area Pump Project Reevaluation Report is furnished
> for information.

---

[13] See 2 Compendium 630.

Id.  On the same day (March 28, 1983), two letters were also provided to the Chairmen of the

House and Senate Public Works Committees with jurisdiction over the Fish and Wildlife

Mitigation Report.[14]  These two identical letters stated:

> A copy of the proposed report of the Chief of Engineers on Yazoo Backwater
> Project, Mississippi – Fish and Wildlife Mitigation Report, and other pertinent
> reports and a Final Environmental Impact Statement, with addendum, are
> enclosed for your information. Copies of the proposed report of the chief of
> Engineers and the report of the Mississippi River Commission (MRC) have
> been provided [to] Representatives Jamie L. Whitten, 1st District, Mississippi,
> Webb Franklin, 2nd District, Mississippi, G.V. Montgomery, 3rd District,
> Mississippi and Jerry Huckaby, 5th District, Louisiana.
>
> Upon receipt of comments on the proposed report and environmental statement
> from the State of Mississippi and Louisiana and appropriate federal agencies,
> the Chief of Engineers will forward his final report to the Secretary of the
> Army.

See 3 Compendium 1337, 1338.

The Chief of Engineers forwarded the final report on the Mitigation Plan to the

Secretary of Army on July 12, 1984. The Chief of Engineers expressly noted that the

Mitigation Plan's final report was sent to the Secretary of Army "for transmission to

Congress."[15] Congress authorized the Mitigation Plan in the Water Resources Development

Act of 1986. See Pub. L. 99-662, 101 Stat. 4142 (Nov. 17, 1986).  Importantly, the Water

Resources Development Act appears to have only authorized the Mitigation Plan, as it did not

discuss the Yazoo Backwater Project or the Yazoo Area Pump Project.

D.  1982 Reevaluation EIS: Record of Decision

---

[14] The Plaintiff's case is based entirely on the March 28, 1983 letters. Thus, following
the history of the different reports and letters is crucial to the outcome of the Court's decision.

[15] See Letter from Lieutenant General Bratton to The Secretary of the Army (sent July
12, 1984) (2 Compendium 647-650).

The next document important in this case is the Record of Decision ("ROD") concerning the 1982 Reevaluation EIS. As discussed above, Major General Wall, after reviewing the Post Authorization Report, "delegated" authority to sign and approve the 1982 Reevaluation EIS to the MRC.[16] Consistent with this delegation of authority, the MRC signed the ROD for the 1982 Reevaluation EIS on July 7, 1983.[17] See Record of Decision, Yazoo Area Pump Project Reevaluation Report (July 7, 1983) (2 Compendium 640-41). The ROD was then submitted to the EPA's Office of Federal Activities on July 18, 1983. See Letter from Colonel Joseph A. Yore to Director of Federal Activities Paul Cahill (July 18, 1983) (2 Compendium 639). The ROD for the 1982 Reevaluation EIS was then sent to interested parties on July 25, 1983. The transmittal letter contains a mailing list, which is entitled: "LIST OF PERSONS TO RECEIVE RECORD OF DECISION FOR YAZOO AREA PUMP STUDY."[18] See Letter from Lt. Col. Stephen E. Shephard to Planning Divisions – Eastern Tributaries (July 25, 1983). While this 1982 Reevaluation EIS was being transmitted, the Mitigation Report was still being reviewed, as the Mitigation Report was not sent to the Secretary of Army for transmission to Congress until July 12, 1984.

E.  EPA's Veto Decision

After the MRC approved the 1982 Reevaluation EIS and signed the ROD and the Corps responded to the EPA's comments, construction on the Pump Project was initiated in

---

[16] See 2 Compendium 630 (Major General Wall delegating authority); 2 Compendium 640-41 (President of the MRC approving the 1982 Reevaluation Report EIS).

[17] Importantly, as discussed more below, the ROD for the 1982 Reevaluation EIS was not signed until four months *after* the March 28, 1983 "information" letters.

[18] This mailing list includes various congressmen from Mississippi and Louisiana.

1986.[19] See FINAL DETERMINATION OF THE U.S. ENVIRONMENTAL PROTECTION AGENCY'S ASSISTANT ADMINISTRATOR FOR WATER PURSUANT TO SECTION 404(C) OF THE CLEAN WATER ACT CONCERNING THE PROPOSED YAZOO BACKWATER AREA PUMPS PROJECT, ISSAQUENA COUNTY, MISSISSIPPI (Aug. 31, 2008). However, such construction was soon stopped due to the Water Resources Development Act ("WRDA") of 1986, which modified the funding for the project by requiring a local cost-share. See Pub. L. No. 99-662, 100 Stat. 4082, § 103(e)(1). Under this new provision, the local project sponsor would provide the lands, easements, rights-of-way, relocations, and disposal areas for the project, or 25 percent of the construction cost, whichever was greater. As such, all construction was effectively halted. That is, construction was halted until the reauthorization of WRDA ten years later in 1996. This reauthorization reversed the cost-sharing provisions established in 1986 and restored the project to full federal funding and work on the project began once again.

In 1997, the EPA initiated an ecosystem restoration prioritization analysis with the United States Geological Survey. This work evolved into ecological and economic model development for nonstructural floodplain management alternatives in the Yazoo Backwater Area. Between 1998 and 2000, EPA participated in a series of interagency and stakeholder meetings with the Corps, representatives of the Board of Mississippi Levee Commissioners, and other interested parties to present the finding of these studies and discuss concerns regarding the proposed project and potentially less environmentally damaging alternatives.

---

[19] The EPA raised serious concerns about the Project and its effect on the environment in its comments on the 1982 Reevaluation EIS. See FINAL DETERMINATION OF THE U.S. ENVIRONMENTAL PROTECTION AGENCY'S ASSISTANT ADMINISTRATOR FOR WATER PURSUANT TO SECTION 404(C) OF THE CLEAN WATER ACT CONCERNING THE PROPOSED YAZOO BACKWATER AREA PUMPS PROJECT, ISSAQUENA COUNTY, MISSISSIPPI AT 10 (AUG. 31, 2008).

The EPA also voiced its concerns with the proposed project in meetings with the Office of Management and Budget (OMB), CEQ, and representatives from Corps Headquarters in February and March of 2000.

In September 2000, the Corps released another Draft Supplemental EIS for the Project.[20] One of the purposes of this reformulation of the project's 1982 Reevaluation EIS was to respond to a 1991 directive from OMB to evaluate a broader suite of alternatives to the proposed project that would provide: 1) greater levels of flood protection for urban areas; 2) reduced levels of agricultural intensification; and 3) reduced adverse impacts to the environment. The OMB directive also stated that the revised evaluation should include "full consideration of predominantly nonstructural and nontraditional measures" to address flooding issues.

Despite the improvements made to the Project, the EPA remained concerned with the proposed project's impacts to wetlands and associated fish and wildlife resources, its alleged potential to exacerbate existing water quality problems in the Yazoo Backwater Area, the purported inadequacy of the proposed compensatory mitigation, and the uncertainty associated with the proposed reforestation. The EPA expressed these concerns in a November 3, 2000 letter to the Corps on the Draft Supplement EIS. The EPA also identified a number of potentially less environmentally damaging alternatives that emphasized nonstructural and nontraditional measures to address flooding issues. However, in the end, the EPA concluded that the project was environmentally unsatisfactory and noted that it was a candidate for

---

[20] The 2000 Draft EIS is entirely separate from the 1982 Reevaluation EIS – which was in final form in 1983. The 1982 Reevaluation EIS is the EIS that is of primary concern in this action. That is, the Plaintiff never asserts that the 2000 Draft EIS was submitted to Congress prior to appropriation or authorization in order to trigger Section 404(r).

referral to CEQ under Section 309(b) of the Clean Air Act and the CEQ regulations and for further action under CWA Section 404(c).

Between 2002 and 2005, EPA Region IV worked with the Corps to improve the evaluation of the extent of wetlands in the Yazoo Backwater Area, the extent of wetlands potentially impacted by the project, and the nature and degree of these impacts. In November 2007, the Corps released the Yazoo Backwater Area Reformulation Main Report and Final Supplemental Environmental Impact Statement. In a January 22, 2008 letter to the Corps on the Final Supplement EIS, EPA Region IV concluded that the nature and extent of anticipated adverse environmental impacts continued to be significant, and that the EPA continued to have significant concerns with the proposed project. EPA Region IV again identified the project as a candidate for referral to CEQ and for further action pursuant to our authorities under the CWA.

On February 1, 2008, EPA Region IV's Regional Administrator informed the Corps and the Board of Mississippi Levee Commissioners of the Administrator's intent to initiate a CWA Section 404(c) review of the proposed project, based on the Administrator's belief that the project may have an unacceptable adverse effect on fish and wildlife resources. During the 15-day response period following the 404(c) initiation letter (which was extended to March 3, 2008), EPA Region IV met with representatives from the Corps and Board of Mississippi Levee Commissioners. EPA Region IV held a meeting with the Corps and the project sponsor on February 29, 2008, during the initial consultation period. However, even after the meeting, EPA Region IV's Regional Administrator was still not satisfied that no unacceptable adverse

effect would occur. Thus, EPA Region IV took the next step in the section 404(c) process: publication of a Proposed Determination in the Federal Register.

On March 19, 2008, the Regional Administrator published a Proposed Determination to prohibit, restrict, or deny the specification, or the use for specification, of certain waters of the United States in Issaquena County, Mississippi, as a disposal site for the discharge of dredged or fill material in connection with the construction of the proposed Yazoo Backwater Area Pump Project. In accordance with 40 C.F.R. Section 231.3(a)(2), EPA Region IV published notice of the Proposed Determination in the Federal Register on March 19, 2008. See 73 F.R. 14806. The notice established a public comment period from March 19 to May 5, 2008, and indicated a public hearing would be held.

The EPA conducted a public hearing at the Vicksburg Convention Center on April 17, 2008, and the public comment period ended on May 5, 2008.[21]  The EPA's regulations require that the Regional Administrator either withdraw the Proposed Determination or prepare a Recommended Determination within 30 days after the conclusion of the public hearing – in this case, by May 17, 2009. See 40 C.F.R. § 231.5(a). However, in order to allow full

---

[21] Approximately 500 people were in attendance for the five-hour hearing. A total of 67 people provided oral statements, including one representative from the Corps' Vicksburg District and four individuals representing the project sponsor. Of the 62 people not directly affiliated with the project, 32 people spoke in opposition to the proposed pumps project, 29 spoke in favor of the pumps project and one person did not specify a position. In regards to the public comment period, the EPA received approximately 47,600 comment letters including approximately 1,500 individual comment letters and 46,100 mass mail comments. Of the 1,500 individual comments, 97.29 percent urged the EPA to prohibit the proposed pumps project, and 2.52 percent supported construction of the proposed pumps project. In addition, all of the mass mailers urged the EPA to prohibit discharges to waters of the United States associated with the proposed project. See: http://www.regulations.gov/fdmspublic/component/main?main=DocketDetail&d=EPA-R04-OW-2008-0179

consideration of the extensive record, including the 47,600 public comments the EPA received, EPA Region IV extended the time period provided for the preparation of this Recommended Determination until July 11, 2008. <u>See</u> 73 F.R. 27821. This time extension was made under authority of 40 C.F.R. Section 231.8, which allows for such extensions upon a showing of good cause. EPA Region IV reviewed the information provided during the public comment period and completed its review in advance of the July 11 deadline.

The Recommended Determination was signed by the Regional Administrator on June 23, 2008, and represents the culmination of EPA Region IV's Section 404(c) review of the proposed Yazoo Backwater Area Project. Pursuant to the Section 404(c) regulations, <u>see</u> 40 C.F.R. part 231, the Recommended Determination and its administrative record were submitted to EPA Headquarters on July 2, 2008, initiating the time period for review and final action by the EPA's Assistant Administrator for Water.

On June 24, 2008, EPA Administrator Stephen L. Johnson and Assistant Administrator for Water Benjamin H. Grumbles met, at their request, with two U.S. Senators and one Representative from the State of Mississippi to discuss an alternative to EPA's ongoing section 404(c) review of the proposed Yazoo Backwater Area Project. Administrator Johnson indicated that completion of the section 404(c) review would not preclude such initiatives; instead, the Administrator indicated that the information and results from EPA's review could inform discussions on what are viable alternatives. Administrator Johnson also stated that the EPA would provide the Mississippi congressional delegation with copies of the Recommended Determination, which the EPA delivered to the U.S. House and Senate buildings the following day.

In accordance with the section 404(c) regulations, <u>see</u> 40 C.F.R. Section 231.6, the Assistant Administrator for Water offered the opportunity for final consultation to the Office of the Assistant Secretary of the Army for Civil Works and the Mississippi Board of Levee Commissioners, by letters dated July 2, 2008. The letters provided the Department of the Army and the project sponsor an opportunity to present additional relevant information for the record, including information about any corrective actions that could be taken to prevent unacceptable adverse effects from the proposed project. The Mississippi Board of Levee Commissioners responded to the consultation notification in a letter dated July 8, 2008, by requesting a 30-day time extension of the final consultation period as well as a meeting with EPA and the Corps. The EPA replied in a letter dated July 10, 2008, granting the project sponsor a fifteen day extension, until August 1, 2008, to provide comments.

On July 22, 2008, the project sponsor submitted initial comments on the Recommended Determination. The major points raised in the letter were also discussed during a meeting held with the Mississippi Board of Levee Commissioners and their counsel on July 25, 2008, at the EPA's Headquarters Offices in Washington, D.C. The Assistant Administrator for Water presided over the meeting, which was also attended by the Assistant Secretary of the Army for Civil Works, EPA Region IV's Regional Administrator for the Section 404(c) action, as well as management, staff, and counsel from EPA and the Assistant Secretary of the Army for Civil Works/Corps of Engineers Headquarters Offices. During the meeting (and in the July 22, 2008 letter), the project sponsor raised six major points. The one point raised that is relevant to this case concerns whether the EPA lacks the legal authority to invoke Section 404(c) due to Section 404(r) of the CWA.

The EPA also received a letter from two U.S. Senators from Mississippi, which likewise raised the issue of the EPA's legal authority to pursue Section 404(c) in the context of the proposed project and provided a copy of a Congressional Research Service ("CRS") memorandum on the limited exemption for certain federal projects included under section 404(r) of the CWA. The EPA provided an initial response to the Senators on July 25, 2008, stating that the EPA had consulted with the Corps and reviewed the requirements and legislative history of CWA Section 404(r) prior to initiating section 404(c) review on February 1, 2008. Based on such information available at the time, the EPA determined that 404(r) was not applicable to the Yazoo Backwater Area Project because the statutory preconditions for qualification under Section 404(r) had not been met. The EPA also indicated that additional time was needed to evaluate information provided by the Mississippi Board of Levee Commissioners at the July 25, 2008 meeting relevant to the Section 404(r) issue.

The EPA subsequently submitted a letter to the Senators on August 6, 2008, stating that while the CRS report provided an accurate description of the meaning of section 404(r), it did not reach a conclusion regarding the applicability of section 404(r) to the proposed project. The EPA then engaged in further consultation with the Corps and the Department of the Army regarding Section 404(r). The EPA reached the same conclusion as it previously did, finding that Section 404(r)'s exemption had not been triggered because there was no evidence that an EIS for the proposed project was ever submitted to Congress prior to either authorization for the project or an appropriation of funds for its construction. In the EPA's Final Determination, it once again reiterated that "the limited exemption established at section 404(r) does not apply to the proposed project." The Board of Mississippi Levee

Commissioners ("Plaintiff") appeals the EPA's conclusion regarding the applicability of Section 404(r) to the project at issue in this case.

## II. SUMMARY JUDGMENT STANDARD

Summary judgment is warranted under Rule 56(c) when evidence reveals no genuine dispute regarding any material fact, and that the moving party is entitled to judgment as a matter of law. FED. R. CIV. P. 56(c). The party moving for summary judgment bears the initial responsibility of informing the district court of the basis for its motion and identifying those portions of the record it believes demonstrate the absence of a genuine issue of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 323, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986). The non-moving party must then go beyond the pleadings and designate "specific facts showing that there is a genuine issue for trial." Id. at 324, 106 S. Ct. 2548. Conclusory allegations, speculation, unsubstantiated assertions, and legalistic arguments are not an adequate substitute for specific facts showing a genuine issue for trial. TIG Ins. Co. v. Sedgwick James of Wash., 276 F.3d 754, 759 (5th Cir. 2002); SEC v. Recile, 10 F.3d 1093, 1097 (5th Cir. 1997); Little v. Liquid Air Corp., 37 F.3d 1069, 1075 (5th Cir. 1994) (en banc).

In reviewing the evidence, factual controversies are to be resolved in favor of the nonmovant, "but only when . . . both parties have submitted evidence of contradictory facts." Id. In the absence of proof, the court does not "assume that the nonmoving party could or would prove the necessary facts." Id.[22]

_____

[22] Under the Administrative Procedure Act, when a dispute requires review of an administrative record, a district court looks to the agency's decision to determine whether the decision was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law." 5 U.S.C. § 706(a)(2). The reviewing court must determine whether that agency "considered the relevant factors and articulated a rational connection between the facts found

## III. ANALYSIS AND DISCUSSION

The single controversy in this case is whether the Yazoo Area Pump Project[23] ("Pump Project") falls within the requirements of Section 404(r) of the CWA. That is, Plaintiff contends that the EPA's Final Determination is barred by Section 404(r). The Defendants contend that the Pump Project does not meet the statutory requirements under Section 404(r) because (1) an EIS was never "submitted to Congress," and (2) the Pump Project was not "specifically authorized" by Congress.

***Whether an EIS was "Submitted to Congress"***

In the EPA's Final Determination, it concluded that Section 404(r) was inapplicable because a Final EIS was never submitted to Congress. Under Section 404(r) of the CWA, a "specifically authorized" Federal project is not subject to regulation when:

> information on the effects of such discharge, including consideration of the guidelines developed under subsection (b)(1) of this section, is included in an environmental impact statement for such project pursuant to the National Environmental Policy Act of 1969 and such environmental impact statement has been *submitted to Congress* before the actual discharge of dredged or fill material in connection with the construction of such project and prior to either authorization of such project or an appropriation of funds for such construction.

---

and the choice made." <u>Baltimore Gas & Elec. Co. v. Natural Res. Def. Council, Inc.</u>, 462 U.S. 87, 105, 103 S. Ct. 2246, 76 L. Ed. 2d 437 (1983). In this case, while Plaintiff is challenging the EPA's decision regarding the applicability of Section 404(r) of the CWA, Plaintiff is *not* challenging the EPA's underlying factual determinations contained within the Section 404(c) veto. <u>See</u> Plaintiff's Complaint at 12. Thus, the Court does not address the EPA's factual determinations on the environmental impact of the Yazoo Backwater Project or review such determinations under the arbitrary or capricious standard.

[23] The "project" authorized by Congress in the 1941 FCA appears to be referred to as the "Yazoo Backwater Project." In regards to the "project" at issue in this case, the Court refers to it as the "Yazoo Area Pump Project," drawing this language directly from the MRC. <u>See</u> 2 Compendium 630.

33 U.S.C. § 1344(r) (emphasis added). Plaintiff, pointing to the Energy and Water Development Act of 1985, contends that a Final EIS was submitted to Congress before an appropriation of funds for the construction of the Pump Project.[24] Specifically, Plaintiff alleges that two identical cover letters submitted to the Chairmen of the Public Works Committees of the House and the Senate illustrate that a Final EIS on the Pump Project was submitted to Congress in March 1983.

*The March 1983 Letters*

In order to grasp the nature of the March 28, 1983 letters, a close review of the record is necessary. The following is a timeline of relevant dates with respect to the Final EIS and Pump Project issues:

- 1941:                      Flood Control Act

- 1982:                      Reevaluation EIS prepared

- Feb. 3, 1983:        Post Authorization Report and 1982 Reevaluation EIS sent to Major General Wall. Wall approved the Post Authorization Report and "delegated" the approval of the Reevaluation EIS to the MRC. Wall also noted that that the Corps was considering the Mitigation Report and would dispatch it in the near future.

- Mar. 28, 1983:      A proposed Mitigation Report was sent to States, agencies, and to the Directors of the Committees of Public Works requesting comments.

- May 13, 1983:       EPA submits comments on the 1982 Reevaluation EIS.

- July 7, 1983:        MRC approved the 1982 Reevaluation EIS and signed

---

[24] To clarify, Plaintiff contends that the authorization for the Pump Project stemmed from the 1941 FCA, and that the appropriation of funds for its construction came from the Energy and Water Development Appropriation Bill of 1985, Pub. L. 98-360, 98 Stat. 403 (July 16, 1984). Thus, Plaintiff does not contend that an EIS was submitted to Congress prior to alleged "authorization" of the Pump Project.

the ROD.

- July 12, 1984:　　　　Corps responded to the EPA's comments on the Reevaluation-EIS. The Chief of Engineers forwarded the final report on the Mitigation Plan to the Secretary of Army for transmission to Congress.

As noted above, there are multiple reports discussed in this case. The three reports that overlap, yet must be treated separately, are: (1) the 1982 Reevaluation EIS, (2) the Post Authorization Report, and (3) the Mitigation Report.[25] As can be seen from the timeline above, in February 1983, Major General Wall delegated the approval of the Reevaluation EIS to the MRC because it was determined from the Post Authorization Report that congressional approval was not needed. However, based on the nature of the Mitigation Report, it was determined that congressional authority would be needed. On February 3, 1983, Major General Wall also noted that the Corps was considering the Mitigation Report and would dispatch the Chief of Engineers' report to States and agencies in the near future. This occurred on March 28, 1983, with the transmission of a series of letters. See Letter from Lieutenant General J.K. Bratton, Chief of Engineers of the Army Corps, to Charles R. Jeter, Regional Administrator of the EPA (2 Compendium 631). In Lieutenant General Bratton's first letter, he stated:

> Enclosed for your review and comment are seven copies of the proposed report of the Chief of Engineers on Yazoo Backwater Project, Mississippi – Fish and Wildlife Mitigation Report, and other pertinent reports and a Final Environmental Impact Statement with addendum prepared in accordance with Section 102 (2) (C) of the National Environmental Policy Act of 1969 (Public Law 91-190). The Yazoo Area Pump Project Reevaluation Report is furnished for information.

---

[25] The Plaintiff's Motion for Summary Judgment fails to adequately distinguish between the initial Yazoo Backwater Project, the 1982 Reevaluation Report concerning the Yazoo Area Pump Project, the Post Authorization Report, and the Mitigation Report.

Id.  On the same day (March 28, 1983), two identical similar letters were also provided to the Chairmen of the House and Senate Public Works Committees with jurisdiction over the Fish and Wildlife Mitigation Report.  This letter stated:

> A copy of the proposed report of the Chief of Engineers on Yazoo Backwater Project, Mississippi – Fish and Wildlife Mitigation Report, and other pertinent reports and a Final Environmental Impact Statement, with addendum, are enclosed for your information. Copies of the proposed report of the chief of Engineers and the report of the Mississippi River Commission (MRC) have been provided [to] Representatives Jamie L. Whitten, 1st District, Mississippi, Webb Franklin, 2nd District, Mississippi, G.V. Montgomery, 3rd District, Mississippi and Jerry Huckaby, 5th District, Louisiana.
>
> Upon receipt of comments on the proposed report and environmental statement from the State of Mississippi and Louisiana and appropriate federal agencies, the Chief of Engineers will forward his final report to the Secretary of the Army.

See 3 Compendium 1337, 1338.  Plaintiff contends that the letters sent to the Chairmen of the Public Works Committees, that were transmitted "for information," equates to a submission to Congress; thus, invoking Section 404(r).  The Court is unconvinced by such an assertion.

The stated purpose of the letters was to transmit a review copy of the Mitigation Report – a separate "project" requiring separate congressional authorization.  The Plaintiff has staked its entire case on the fact that the letters also state that a Final EIS was enclosed. Plaintiff reasons that this Final EIS relates to the Pump Project, thus meaning that a finalized EIS was indeed submitted to Congress.  While there is no direct evidence concerning this unnamed Final EIS, as it apparently no longer exists, the last paragraph of the letters provides some insight.  The letters state that, "upon receipt of comments on the proposed report *and environmental statement* . . . the Chief of Engineers will forward his final report to the Secretary of the Army." (Emphasis added). After receiving comments on the report and the

environmental statement, a final report was forwarded to the Secretary of Army on July 12, 1984. The final report related to the Mitigation Plan – the plan to acquire land to mitigate environmentally harmful impacts; it did not concern the specifics of the Pump Project. Thus, if comments were requested and received on an environmental statement, and the final report stemming from those comments related to the Mitigation Plan and not the Pump Project, it logically follows that the environmental statement was not in reference to the Pump Project either.

Moreover, the March 28 letter to the EPA is also instructive. The EPA letter makes clear that a Final EIS *and* the Pump Project Reevaluation Report were attached. The letter refers to two separate attachments – two separate documents.[26] Further, the letters sent to the Public Works Committees are both entirely void of language referring to the Pump Project. While, as noted, the March 28, 1983 letter sent to the EPA[27] does contain a reference to the Pump Project, the reference is discussed in a separate sentence than the discussion of the Mitigation Report and Final EIS. That is, the reference to the Final EIS is never mentioned in regards to the Pump Project.

More telling, the "Final" EIS referenced in the letters could not have been in relation to the Pump Project because any EIS relating to the Pump Project was yet to be in its "final" stages as of March 1983. In order to qualify for exemption under Section 404(r), the "procedural and substantive" requirements of that section must be satisfied. See COMMITTEE

---

[26] The Court again stresses that the Yazoo Backwater Project, Mississippi – Fish and Wildlife Mitigation Report and the 1982 Reevaluation EIS on the Yazoo Area Pump Project are two separate reports on two separate projects: The Mitigation Plan is a project to acquire land. A project in which the Corps found congressional authority to be necessary. The Pump Project is the project at issue in this case: the construction of a single pump station.

[27] Of course, a letter sent to the EPA cannot constitute a submission "to Congress."

ON PUBLIC WORKS, 95TH CONGRESS, 2D SESSION, A LEGISLATIVE HISTORY OF THE CLEAN WATER ACT OF 1977 A CONTINUATION OF THE LEGISLATIVE HISTORY OF THE FEDERAL WATER POLLUTION CONTROL ACT, Volume 3 at 529 (Comm. Print 1978). Further, for a project to fall under Section 404(r), an "adequate" EIS must have been submitted. Id. Here, any EIS submitted in March 1983 could not be considered adequate, as the 1982 Reevaluation EIS for the Pump Project was still pre-decisional at that time. The letters explicitly note that the driving purpose was to request comments, illustrating that a review process was still underway. In 1980, the CEQ published a memorandum of guidance on applying Section 404(r). This CEQ memorandum stresses: "In order to satisfy this provision, it is important that the environmental impact statement process *be completed* before requests for authorizations *and appropriations* are approved by Congress for federal projects which will involve the discharge of dredged or fill material in waters of the United States, including wetlands, and before actual discharges occur."[28] Moreover, the legislative history to Section 404(r) makes clear that in order to trigger an exemption, "Congress must have . . . modifications recommended by reviewing agencies." See COMMITTEE ON PUBLIC WORKS, 95TH CONGRESS, 2D SESSION, A LEGISLATIVE HISTORY OF THE CLEAN WATER ACT OF 1977 A CONTINUATION OF THE LEGISLATIVE HISTORY OF THE FEDERAL WATER POLLUTION CONTROL ACT, Volume 3 at 530. (Comm. Print 1978). The letters to the Chairmen of the Public Works Committees were dated March 28, 1983. Yet, the EPA did not submit comments until May

---

[28] Executive Office of the President Council on Environmental Quality, Memorandum for Heads of Agencies, Guidance on Applying Section 404(r) of the Clean Water Act to Federal Projects Which Involve the Discharge of Dredged or Fill Materials into Waters of the U.S., Including Wetlands (Nov. 17, 1980) (emphasis added), *available at* http://ceq.hss.doe.gov/nepa/regs/cwa404rguidance.pdf

13, 1983. Thus, modifications and recommendations were not submitted by the EPA until two months after the letters were circulated, demonstrating that the EIS process was far from "completed." Likewise, the ROD – which symbolizes an agency's finalized decision – was not issued until July 1983, four months after the March 28, 1983 letters. Moreover, the legislative history to Section 404(r) also states that, "Of course, hearings on federally authorized projects will be expected to receive testimony on the adequacy of the particular EIS on the question of dredge and fill material." Id. at 534. There is no evidence in this case of any testimony or discussion relating to the adequacy of the 1982 Reevaluation EIS or the Pump Project at all. Accordingly, the record is void of any indication showing that the Final EIS mentioned in the March 28, 1983 letters related to the Pump Project and, even if the Final EIS did refer to the Pump Project, such an EIS was not in final or adequate form as required under Section 404(r).[29]

*"Submitted to Congress" under Section 404(r)*

Even assuming the Court viewed the EIS referenced in the March 28, 1983 letters as relating the Pump Project and as being final and adequate, there is no evidence that the EIS was "submitted to Congress" within the meaning of Section 404(r). The Court begins by noting that the CWA does not define the term "submitted to Congress." However, despite this lack of formal definition, the letters fail to meet the Section 404(r) standard. The plain language of the statute requires an EIS to be submitted to Congress as a whole. As the Defendant Intervenors aptly conclude, Congress is well aware of the distinction between a

_____

[29] Plaintiff contends that it is irrelevant that a Final EIS was sent in combination with the Mitigation Report. However, such an assertion misses the point. The problem is not that a Final EIS was sent with the Mitigation Report. The issue is that there is no evidence that an adequate Final EIS *on the Pump Project* was ever sent to Congress at all.

submission "to Congress" and a submission to certain committees. This can be seen throughout the framework of numerous statutes and, importantly, the distinction is evident even within the CWA. In 33 U.S.C. Section 1263(e), Congress placed a mandate on the EPA, requiring the Administrator to "submit a report of the results of the study . . . to the Committee on Environmental and Public Works of the Senate and to the Committee on Public Works and Transportation of the House of Representatives." In contrast, Section 404(r) prescribes a submission to the entire body of Congress, as opposed a particular committee. See 123 Cong. Rec. 39209 (Dec. 15, 1977) (Statement of Sen. Muskie) (noting that the Section 404(r) exemption is limited to projects approved "by Congress" and that even projects authorized "by congressional committee resolution" are not eligible for the exemption). Here, the March 28 letters were addressed only to the Chairmen of the Public Works Committees of the House and the Senate, and they bore no indicia of a formal submission to Congress. That is, the letters do not provide the name of the document, there is no indication or request that the Committee take any action, and the letters were sent for "information[al]" purposes.[30]

The mandate contained in Executive Order 12322 also confirms that an EIS was not "submitted to Congress." Executive Order 12322 directs, "Before any agency or officer thereof submits to the Congress, or to any committee or member thereof, for approval, appropriations, or legislative action any report, proposal, or plan relating to a Federal or

---

[30] Plaintiff asserts that the "for information" language should only be read in regards to the Mitigation Report as opposed to this unnamed Final EIS allegedly relating to the Pump Project. First, Plaintiff provides no support for such an assertion. Second, in the March 28, 1983 letter to the EPA – a letter paralleling the March 28 letters to the Chairmen of the Public Works Committees – it makes clear the "for information" reference is also in regards to the Pump Project. Third, while the letter to the EPA mentions the Pump Project Report, the letters to the Public Works Committee are void of *any* reference to the Pump Project.

Federally assisted water and related land resources project or program, such report, proposal, or plan shall be submitted to the Director of the Office of Management and Budget." Exec. Order § 12322, § 1 (Sept. 17, 1981). The Executive Order further provides that, when any such report is "submitted to Congress, or to any committee or member thereof, it shall include a statement of the advice received from the Office of Management and Budget." Id. at § 3. Plaintiff claims that the Executive Order requiring reports be submitted to OMB is inapplicable "on its face." Plaintiff asserts that the EIS was not intended for congressional appropriation or legislative action of any kind. Instead, Plaintiff contends that the EIS was submitted for the sole purpose of "review under Section 404(r)." However, under Section 404(r), it is Congress's duty, as opposed to an agency's, to evaluate and approve the EIS. See COMMITTEE ON PUBLIC WORKS, 95TH CONGRESS, 2D SESSION, A LEGISLATIVE HISTORY OF THE CLEAN WATER ACT OF 1977 A CONTINUATION OF THE LEGISLATIVE HISTORY OF THE FEDERAL WATER POLLUTION CONTROL ACT, Volume 3 at 503. (Comm. Print 1978) (noting that to safeguard the provisions of the CWA, under Section 404(r), an EIS will be "reviewed and approved by Congress," and that "[a] great deal of responsibility is being places in [Congress] to insure that these Federal projects . . . will be conducted in an environmentally safe manner."). This evaluation and approval for Section 404(r) purposes is indeed a "legislative action" on a "report" submitted from an "agency or officer thereof." As Plaintiff's summary judgment motion even noted, Section 404(r) is only triggered by "affirmative congressional action." Further, the Executive Order mirrors the Corps' *own procedures* that require a report to be submitted to the OMB.[31] Likewise, the CEQ's

_____

[31] According to the Corps, once the Chief of Engineers considers comments on a

memorandum of guidance on Section 404(r) states that, "the written views of these two agencies [referring to the Corps and the EPA] will be transmitted *to OMB* and to the Congress."[32] <u>See</u> Executive Office of the President Council on Environmental Quality, Memorandum for Heads of Agencies, <u>Guidance on Applying Section 404(r) of the Clean Water Act to Federal Projects Which Involve the Discharge of Dredged or Fill Materials into Waters of the U.S., Including Wetlands</u> (Nov. 17, 1980) (emphasis added). Here, there is no evidence that a report or a written review on the Pump Project was ever submitted to the OMB by the EPA or the Corps prior to the alleged appropriation for the Project in the Energy and Water Development Act of 1985.

Moreover, the United States House of Representatives has promulgated official rules relating to communications transmitted to the House. Such rules, which were in existence in 1983, provide that all communications "from the executive departments intended for the consideration of any committees of the House be addressed to the Speaker . . . for referral to the appropriate committees." Rule XII, clause 8, § 827. Plaintiff, while apparently conceding that the House rules were not followed, states that the March 28 letters were "not intended for the consideration of any particular Committee." However, in the following couple of sentences, Plaintiff goes on to contradict that assertion. Plaintiff states that, "it is only

---

proposed report and EIS, the Chief will prepare the final report and submit it to the Secretary of Army. <u>See</u> U.S. Army Corps of Engineers, <u>The Six Steps to a Civil Works Project</u>. The Chief's report is then reviewed by the Assistant Secretary of the Army (Civil Works). <u>Id.</u> Next, the Office of Management and Budget (OMB) comments on the report as it relates to the President's programs. <u>Id.</u> After OMB provides its views, the Assistant Secretary of Army (Civil Works) then transmits the Chief of Engineers' report to Congress. <u>Id.</u>

[32] As discussed above, any alleged EIS in the March 1983 letters relating to the Pump Project could not have contained the "written views" of the EPA, as the EPA did not submit its written views until May 1983.

reasonable to assume that an agency would and should send a Section 404(r)-triggering EIS directly to the House and Senate Committees that would have chief interest and jurisdiction over the project."   Given this, Plaintiff's assertion that a Final EIS was not intended for consideration by a House Committee makes no sense, especially since the March 28 letters were indeed sent to a Committee.  By Plaintiff's logic, an EIS report should only be submitted directly to a particular Committee – as it was in this case – if it was *not* intended for consideration by that Committee.  Such an assertion is entirely illogical. As Plaintiff even points outs, under Section 404(r), it is intended that the "EIS will come before the appropriate committees" and that there will be "a thorough process of Committee review." <u>See</u> COMMITTEE ON PUBLIC WORKS, 95TH CONGRESS, 2D SESSION, A LEGISLATIVE HISTORY OF THE CLEAN WATER ACT OF 1977 A CONTINUATION OF THE LEGISLATIVE HISTORY OF THE FEDERAL WATER POLLUTION CONTROL ACT, Volume 3 at 534, 503. (Comm. Print 1978).  In the House of Representatives, the Speaker refers communications from the executive branch to the appropriate committees.   Here, the letters were undisputedly not addressed to the Speaker of the House.

As discussed above, on February 3, 1983, Major General Wall delegated the duty to review and approve the 1982 Reevaluation EIS on the Pump Project to the MRC. This delegation of duty to the MRC further supports the conclusion that a Final EIS was not "submitted to Congress."  On July 7, 1983 – four months after the March 28 letters – the MRC evaluated and approved the EIS and signed the ROD for the Pump Project. However, under Section 404(r), it is Congress's duty to evaluate, review, and approve the Final EIS for a particular project. <u>See</u> COMMITTEE ON PUBLIC WORKS, 95TH CONGRESS, 2D SESSION, A

LEGISLATIVE HISTORY OF THE CLEAN WATER ACT OF 1977 A CONTINUATION OF THE LEGISLATIVE HISTORY OF THE FEDERAL WATER POLLUTION CONTROL ACT, Volume 3 at 503. (Comm. Print 1978) (noting that to safeguard the provisions of the CWA, under Section 404(r), an EIS will be "reviewed and approved by Congress.").  However, Congress did not undertake that obligation in this case. That is, the delegation of responsibility to the MRC effectively removed from Congress's purview its duty to evaluate and approve the 1982 Reevaluation EIS.  This delegation of duty to the MRC makes sense in light of the fact that the Corps itself – who did not join this lawsuit – has conceded that it never intentionally invoked Section 404(r).[33]  See Letter in Response from John Paul Woodley, Jr., Assistant Secretary of the Army (Civil Works), to Honorable Thad Cochran, United States Senate (Feb. 2003) ("I have been advised by the Corps that, as best they can determine at the time, the Corps did not intentionally invoke the provisions of subsection 404(r) regarding the Yazoo Backwater Project.") (3 Compendium 1354-55).  While the Court agrees with the Plaintiff that just because the Corps did not "intentionally" invoke Section 404(r) does not mean that

---

[33] It is important to note that the Corps' procedures for submitting a report "to Congress" can be seen via the Mitigation Report.  In compliance with Corps procedures, the Chief of Engineers forwarded the final report on the Mitigation Plan to the Secretary of Army on July 12, 1984.  The Chief of Engineers expressly noted that the Mitigation Plan's final report was sent to the Secretary of Army "for transmission to Congress." See Letter from Lieutenant General Bratton to The Secretary of the Army (sent July 12, 1984) (2 Compendium 647-650).  While the Mitigation Plan was sent to Congress for authorization purposes, and any report on the Pump Project would have purportedly been sent for appropriation purposes, there is no distinction between authorization and appropriation when it comes to *how* a report or EIS is "submitted to Congress." That is, neither Section 404(r) nor Corps regulations provide differing procedures to follow for transmissions to Congress depending on whether such a transmission is for appropriation or authorization. As such, the Mitigation Plan at least demonstrates *how* any given report would properly be "submitted to Congress" by the Corps.

the requirements of that section were not met, there is no other evidence that Section 404(r) applies to this case. In fact, contrary to Plaintiff's assertions, the evidence shows that, instead of attempting to receive a 404(r) exemption, the Corps intended to comply with the CWA by obtaining a state water quality certification.[34]

The Plaintiff contends that the Corps actually invoked Section 404(r), despite its contention that it did not, due to the Corps' Vicksburg District's <u>Water Resource Policies and Authorities: Application of Federal Regulations Implementing Section 404 to Civil Works Projects</u> (Sept. 18, 1979) ("Vicksburg SOP"). This guidance issued by the Corps' Vicksburg District describes several options that the Corps can utilize to comply with or seek exemption from Section 404 of the CWA. As applicable to the Pump Project, the Vicksburg SOP provided three separate options: (1) "Option B" would allow the Corps to seek a Section 404(r) exemption through the congressional authorization process; (2) "Option C" would permit the Corps to obtain a water quality certification from the affected State (i.e., Mississippi); and (3) "Option D" would allow the Corps to seek a Section 404(r) exemption through the congressional appropriation process. Plaintiff asserts that the Vicksburg SOP conclusively confirms that "Option D was selected for the Yazoo Project." However, contrary to Plaintiff's assertion, the Vicksburg SOP never confirms this. The guidance issued by the Vicksburg District only lays out options that the Corps *can* utilize to comply with or be exempt from the CWA; the guidance is neither project specific nor does it reach any particular conclusion. Thus, the Vicksburg SOP does not provide support for the Plaintiff's contention

---

[34] <u>See</u> Corps Vicksburg District, Public Meeting Notice and Information Summary: The Yazoo Area Pump Project ("compliance with section 404 of the Clean Water Act is necessary.").

that the Corps intentionally invoked Section 404(r).  In fact, the Corps did *not* choose "Option D" as a mechanism to comply with or be exempt from the CWA; instead, the Corps actually decided to seek a state-issued water quality permit from the State of Mississippi under "Option C."[35]  Moreover, not only did the Corps apply for a Section 401 water quality certification, the Corps also received such a certification from the State of Mississippi for construction of the Pump Project.[36]  <u>See</u> Letters to Colonel Dennis York, Corps of Engineers Vicksburg District, from Charles Chisholm, Bureau Direct of the Dept. of National Resources Bureau of Pollution Control (Feb. 3, 1983 & June 4, 1985) (issuing state certification to the Corps pursuant to Section 401).[37]  As such, the Corps did not intentionally invoke Section

---

[35] <u>See</u> Yazoo Backwater Area Reformulation: Main Report (2007) (1 Compendium 337) (noting that the plan should be implemented by "seek[ing] certification from MDEQ under Section 401 of the CWA and will consider the views of the State and the public from the Section 401 certification process as well. Assuming the ROD approves the recommended plan and the State of Mississippi issues a Water Quality Certification, the project will proceed."); <u>see also</u> Letter from Colonel Samuel P. Collins, Corps of Engineers, to Charlie Blalock, Executive Director of Mississippi Department of Natural Resources (Feb. 26, 1982) ("The purpose of this letter is to request your review and comment on the inclosed [sic] draft Phase 1 General Design Memorandum (GDM) and Environmental Impact Statement (EIS) for the Yazoo Area Pump Project, Yazoo Basin, Mississippi (Incl 1). In addition, we are requesting a water quality certification pursuant to Section 401 of the Clean Water Act for those activities associated with the project.").

[36] The Plaintiff contends that the Corps must have sought a Section 404(r) exemption because they began dredge and fill activity in 1986.  Plaintiff asserts that without a Section 404(r) exemption, such dredge and fill activity would be "illegal." This contention is factually flawed.  As noted, the Corps received a state-issued water quality certification from the State of Mississippi well before the 1986 dredging began, making such activity not "illegal." The activity did not become technically "illegal" until the EPA vetoed the project pursuant to its Section 404(c) authority.

[37] In a footnote, Plaintiff also alleges that the State of Mississippi does not have the authority to issue a water quality certification.  This is plainly incorrect.  Plaintiff confuses the two different permitting options available to states. The first option available is the option of actually "assuming" permitting authority under the CWA. This means that States or Tribes assume the authority to issue Section 404 permits. That is, State assumption of the 404 program allows a state to assume jurisdictional responsibility to condition, approve, or deny

36

404(r), and there is no evidence they unintentionally invoked such an exemption either.

Indeed, the Corps would actually have no reason to use Section 404(r)'s exemption given that

it was intending to comply with the CWA through a state-issued permit under Section 401.[38]

Plaintiff next makes a separation of powers argument to support its conclusion that the

Pump Project is not subject to a Section 404(c) veto. Plaintiff asserts that Congress intended

that it would be the final arbiter under Section 404(r). Due to this, Plaintiff contends that,

because funds were appropriated to the Pump Project in the Energy and Water Development

Appropriation Bill of 1985, Congress must have viewed, evaluated, and approved a Final EIS

related to the Pump Project; thus, making the project exempt under Section 404(r). The Court

agrees that Congress as a whole is the final arbiter of an EIS under Section 404(r). However,

Plaintiff's argument is inapposite in this case because there is no evidence Congress ever

---

dredge and fill permits rather than the Corps. To date, only the States of Michigan and New
Jersey have assumed such authority. This is what Plaintiff relies on for the proposition that
Mississippi does not have the ability to approve permits. However, Mississippi does have
authority to *issue* water quality certifications under the CWA. See MISS. CODE ANN. § 49-17-
28. According to the Vicksburg SOP, "[t]he basic requirements under Option C are as
follows: (a) Issue Section 404 public notice and opportunity for a Section 404 public hearing.
. . . (b) Obtain Section 401 water quality certification from affected state. (c) Prepare Section
404 Evaluation Report." Here, the Corps complied with Option C: (a) the Corps had a
Section 404 public hearing in April 1982, (b) the Corps, as noted, *received* a Section 401
water quality certification from the State of Mississippi, and (c) the Corps prepared a 404
Evaluation Report and delegated the authority to evaluate, approve, and sign the report to the
MRC. Moreover, while the Corps must comply with the CWA – as noted in the Vicksburg
SOP, the Corps does not have to issue *itself* a Section 404 permit, see 33 C.F.R. § 335.2; thus,
for purposes of this case, the fact that Mississippi has chosen not to "assume" the Corps'
permitting authority is irrelevant.

[38] Further, the Corps has even conceded that "based on [ ] current guidance, [the
March 1983 letters] would not meet the criteria for the application for a 404(r) exemption."
See Letter in Response from John Paul Woodley, Jr., Assistant Secretary of the Army (Civil
Works), to Honorable Thad Cochran, United States Senate (Feb. 2003) (3 Compendium 1354-
55).

received – much less approved or evaluated – an EIS for the Pump Project.  If Section 404(r) was never triggered, a separation of powers issue never arises.

Moreover, even if funds were allegedly appropriated to the Pump Project in the Energy and Water Development Appropriation Bill of 1985, it does not compel the conclusion that Congress received the EIS.  Congress, as the legislative body, appropriates funds to a vast majority of federal or federally-assisted projects – projects in which the appropriate agency evaluates the EIS and the Corps issues a permit.  Merely because funds flow to a project does not mean every project is exempt from the CWA.   If that were the case, compliance with Section 404 of the CWA would never be necessary. The "limited"[39] exemption in 404(r) would swallow the entire CWA regulation process.   Here, the Corps, intending to comply with the CWA, delegated the duty to approve the EIS and sign the ROD to the MRC.  The record undisputedly reveals that the MRC in fact did approve the EIS and sign the ROD in July 1983.   The record further reveals that the Corps, again intending to comply with the CWA, sought and received a Section 401 state-issued permit.  Yet, unless the project is exempt from CWA regulation, the EPA may still veto the proposed project. See 33 U.S.C. § 1344(c). In other words, attempted *compliance with* the CWA, rather than *exemption from* the CWA, does not remove the case from the EPA's authority under Section 404(c) to veto a specific project.  Accordingly, because the Court finds that there is no evidence a final

_____

[39] See COMMITTEE ON PUBLIC WORKS, 95TH CONGRESS, 2D SESSION, A LEGISLATIVE HISTORY OF THE CLEAN WATER ACT OF 1977 A CONTINUATION OF THE LEGISLATIVE HISTORY OF THE FEDERAL WATER POLLUTION CONTROL ACT, Volume 3 at 288 (Comm. Print 1978).

and adequate EIS was "submitted to Congress," Section 404(r)'s exemption is inapplicable. As such, the EPA was not barred from utilizing its Section 404(c) veto authority.[40]

## IV. CONCLUSION

For the reasons stated above, the Defendants' Motions for Summary Judgment [38], [41] are GRANTED.

So ordered on this, the  __28th__  day of March, 2011.

/s/  Sharion Aycock
UNITED STATES DISTRICT JUDGE

---

[40] Since the Court has determined that a final EIS was not "submitted to Congress," the Court declines to address Defendants' contention that the project at issue was not "specifically authorized" by Congress within the meaning of Section 404(r). Further, because Plaintiff has never challenged the EPA's factual determinations within the Section 404(c) veto decision – instead only claiming the veto was barred by Section 404(r) – the Court also declines to address whether the EPA's Final Determination decision was arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law.